**Opinion issued January 31, 2023**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-21-00209-CV

————————————

**SUNBELT SECURITIES, INC., THE FISHER GROUP, CHERYL BROWN, JEANINE FISHER, AND MONIQUE MANDELL, Appellants**

**V.**

**DAVID MARK MANDELL AND RAY J. BLACK, PERMANENT ADMINISTRATOR OF THE ESTATE OF WILLIAM MANDELL, DECEASED, Appellees**

On Appeal from Probate Court No. 1
Harris County, Texas
Trial Court Case No. 473,747-402

## MEMORANDUM OPINION

Appellants Sunbelt Securities, Inc. (Sunbelt), The Fisher Group, Cheryl

Brown (Brown), Jeannine Fisher (Fisher), (collectively, the Sunbelt Appellants), and

Monique Mandell (Monique) appeal the trial court's orders denying their motions to

compel arbitration and sustaining objections to an affidavit filed in support. After this appeal had been filed but before submission, Monique and appellees David Mandell (David) and Ray J. Black, permanent administrator of the Estate of William Mandell, deceased (the Administrator), settled all of their pending claims against each other.

Due to the settlement between Monique, David, and the Administrator, we dismiss Monique's appeal as moot. The Sunbelt Appellants' appeal is not moot, and we affirm the trial court's denial of the Sunbelt Appellants' motion to compel arbitration.

## Background

The underlying action is a probate dispute involving investment funds that were in William Mandell's investment account at Sunbelt. In 2011, William set up an investment account with The Fisher Group. His brokerage account application was purportedly signed by William, along with Fisher in her capacity as "Registered Rep," and Patrick Smetek in his capacity as "Office Manager/Principal." Fisher and her colleague, Brown, do business together under the assumed name The Fisher Group, and are agents of Sunbelt. Smetek is the founder and Chief Compliance Officer of Sunbelt. William's brokerage account application does not refer to or mention Sunbelt by name, nor does it contain an arbitration clause, but it does contain the following language:

2

Pre-Dispute Arbitration

This account is governed by a pre-dispute arbitration clause, which appears on the last page of the Client Agreement, and you acknowledge that you have received a copy of this clause.

According to the Sunbelt Appellants, the Client Agreement or Brokerage Account Customer Agreement that would have applied to William's account contained the following arbitration provision:

**Resolving Disputes – Arbitration**

This agreement contains a pre-dispute arbitration clause. Under this clause, which becomes binding on all parties when you sign your account application, you, we, and NFS agree as follows:

A. All parties to this agreement are giving up the right to sue each other in court, including the right to a trial by jury, except as provided by the rules of the arbitration forum in which a claim is filed.

B. Arbitration awards are generally final and binding; a party's ability to have a court reverse or modify an arbitration award is very limited.

C. The ability of the parties to obtain documents, witness statements, and other discovery is generally more limited in arbitration than in court proceedings.

D. The arbitrators do not have to explain the reason(s) for their award.

E. The panel of arbitrators will typically include a minority of arbitrators who were or are affiliated with the securities industry.

F. The rules of some arbitration forums may impose time limits for bringing a claim in arbitration. In some cases, a claim that is ineligible for arbitration may be brought in court.

G. The rules of the arbitration forum in which the claim is filed, and any amendments thereto, shall be incorporated into this agreement.

3

All controversies that may arise between me, You and NFS concerning any subject matter, issue or circumstance whatsoever (including, but not limited to, controversies concerning any account, order or transaction, or the continuation, performance, interpretation or breach of this or any other agreement between me, You and NFS whether entered into or arising before, on or after the date this account is opened) shall be determined by arbitration in accordance with the rules then prevailing of the Financial Industry Regulatory Authority (FINRA) or any United States securities self-regulatory organization or United States securities exchange of which the person, entity or entitles against whom the claim is made is a member, as I may designate. If I designate the rules of a United States self-regulatory organization or United States securities exchange and those rules fail to be applied for any reason, then I shall designate the prevailing rules of any other United States securities self-regulatory organization or United States securities exchange of which the person, entity or entities against whom the claim is made is a member. If I do not notify You in writing of my designation within five (5) days after such failure or after I receive from You a written demand for arbitration, then I authorize You and/or NFS to make such designation on my behalf. The designation of the rules of a United States self-regulatory organization or United States securities exchange is not integral to the underlying agreement to arbitrate. I understand that judgment upon any arbitration award may be entered in any court of competent jurisdiction.

This Brokerage Account Customer Agreement included definitions for "us," "we", and "our"—i.e., "your broker/dealer"—, and "account owner," "you" and "your"—i.e., "the owner(s) indicated on the account application." It did not, however, define "me," "I," or "broker/dealer." William named Monique, his wife, as the transfer-on-death (TOD) beneficiary for his account.

Around 2017, David, William's son, opened his own investment account at Sunbelt. David's brokerage account application, like William's, was signed by Fisher in her capacity as "Registered Rep," and "Smetek" in his capacity as "Office

4

Manager/Principal." Similar to William's, David's account application did not contain an arbitration clause, but included the following language: "You acknowledge that this account is governed by a pre-dispute arbitration clause, which appears on the last page of the Brokerage Account Customer Agreement, and that you have read the pre-dispute arbitration clause." According to the Sunbelt Appellants, the Brokerage Account Customer Agreement that would have applied to David's account included the following arbitration provision:

**Resolving Disputes – Arbitration**

This agreement contains a pre-dispute arbitration clause. Under this clause, which becomes binding on all parties when you sign your account application, You, your Broker/Dealer, and NFS agree as follows:

A. All parties to this agreement are giving up the right to sue each other in court, including the right to a trial by jury, except as provided by the rules of the arbitration forum in which a claim is filed.

B. Arbitration awards are generally final and binding; a party's ability to have a court reverse or modify an arbitration award is very limited.

C. The ability of the parties to obtain documents, witness statements, and other discovery is generally more limited in arbitration than in court proceedings.

D. The arbitrators do not have to explain the reason(s) for their award unless, in an eligible case, a joint request for an explained decision has been submitted by all parties to the panel at least 20 days prior to the first scheduled hearing date.

E. The panel of arbitrators will typically include a minority of arbitrators who were or are affiliated with the securities industry.

5

F. The rules of some arbitration forums may impose time limits for bringing a claim in arbitration. In some cases, a claim that is ineligible for arbitration may be brought in court.

G. The rules of the arbitration forum in which the claim is filed, and any amendments thereto, shall be incorporated into this agreement.

All controversies that may arise between me, my Broker/Dealer and NFS concerning any subject matter, issue or circumstance whatsoever (including, but not limited to, controversies concerning any account, order or transaction, National Financial Services LLC, Member NYSE, SIPC or the continuation, performance, interpretation or breach of this or any other agreement between me, my Broker/Dealer and NFS whether entered into or arising before, on or after the date this account is opened) shall be determined by arbitration in accordance with the rules then prevailing of the Financial Industry Regulatory Authority (FINRA) or any United States securities self-regulatory organization or United States securities exchange of which the person, entity or entities against whom the claim is made is a member, as I may designate. If I designate the rules of a United States self-regulatory organization or United States securities exchange and those rules fail to be applied for any reason, then I shall designate the prevailing rules of any other United States securities self-regulatory organization or United States securities exchange of which the person, entity or entities against whom the claim is made is a member. If I do not notify you in writing of my designation within five (5) days after such failure or after I receive from you a written demand for arbitration, then I authorize you and/or NFS to make such designation on my behalf. The designation of the rules of a United States self-regulatory organization or United States securities exchange is not integral to the underlying agreement to arbitrate. I understand that judgment upon any arbitration award may be entered in any court of competent jurisdiction.

This Brokerage Account Customer Agreement included definitions for "us," "we", and "our"—i.e., "your broker/dealer"—, and "account owner," "you" and "your"— i.e., "the owner(s) indicated on the account application." It did not, however, define "me," "I," or "broker/dealer." Neither David's account application nor the

Brokerage Account Customer Agreement mentioned Sunbelt either generally or specifically as "broker/dealer." According to Sunbelt, David closed his account and Sunbelt wrote off the remaining balance of $0.48 in December 2017.

According to David, he and William were estranged for a substantial part of their lives. William murdered David's mother in 1972 and David sued William in 1995 for alleged mismanagement of his mother's estate. *See Mandell v. Mandell*, 214 S.W.3d 682, 686 (Tex. App.—Houston [14th Dist.] 2007, no pet.). David and William repaired their relationship over the years, becoming particularly close in the last few years of William's life. In early January 2019, William was admitted to Memorial Hermann, where he stayed until his death.

On January 23, 2019, Sunbelt received a fax purporting to be from William, who was still in the hospital, requesting that Sunbelt and Fisher transfer all securities and cash from William's account to David's account. At the time of the alleged transfer request, David was not a customer of Sunbelt. Because the alleged fax raised questions with Sunbelt's compliance department, Sunbelt did not honor the alleged request at that time and placed a temporary hold on William's account. After receiving a call from David regarding the requested transfer on January 24, Smetek informed David that Sunbelt could not accept the fax instructions and that David would need to obtain a court order instructing Sunbelt to transfer the funds to him.

7

On January 30, 2019, William died. Monique, the TOD beneficiary for William's account, produced the necessary documents and transfer request to transfer the funds and securities in William's account to her own personal account. Between January 24, 2019 and March 25, 2019, David took no action to prevent Sunbelt from honoring William's designation of Monique as the TOD beneficiary. Accordingly, on March 25, the assets in William's account were transferred to Monique's account.

David filed the underlying suit against the Sunbelt Appellants and Monique[1] in probate court on December 23, 2019. The relevant petition for purposes of this appeal is David's third amended petition, in which David asserted claims against the Sunbelt Appellants for breach of fiduciary duty, conspiracy, tortious interference with contract, negligent misrepresentation, fraud, and promissory estoppel based on, among other things, the Sunbelt Appellants' failure to transfer the assets in William's account to David upon receipt of the notarized letter. David also asserted similar causes of action related to William's account against Monique for conspiracy, aiding and abetting the breach of fiduciary duty, tortious interference with contract, conversion, and fraud, as well as other causes of action against Monique related to other real property not associated with William's account at issue

---

[1]     David also sued Leonard Mandell, William's brother. Leonard is not a party to this appeal.

8

here. The permanent administrator of William's estate, Ray J. Black, intervened claiming the suit affected assets of William's estate.

The Sunbelt Appellants and Monique moved to compel arbitration "to a FINRA [Financial Industry Regulatory Authority] arbitrator in accordance with FINRA arbitration rules" based on the arbitration agreements contained in the Brokerage Account Customer Agreements purportedly applicable to William and David's accounts. In support of their motion to compel arbitration, the Sunbelt Appellants submitted the affidavit of Smetek, along with various supporting documents, including account statements from William's and David's accounts, the account applications for William's and David's accounts, and the Brokerage Account Customer Agreements for William's and David's accounts. David and the Administrator opposed the motions to compel and objected to portions of Smetek's affidavit on the grounds of lack of personal knowledge, hearsay, speculation, conclusory statements, and inadequate authentication.

The trial court conducted two hearings on the motions to compel arbitration on March 8, 2021 and March 26, 2021. On April 9, 2021, the trial court signed three orders; one order globally sustained all the objections to Smetek's affidavit, and the other two orders denied the Sunbelt Appellants' and Monique's motions to compel arbitration.

On April 16, 2021, the Sunbelt Appellants filed a motion for clarification of the evidentiary rulings or, in the alternative, for reconsideration of the evidentiary rulings. After hearing the motion for reconsideration on April 26, 2021, the trial court signed an amended order on the objections to the affidavit of Patrick Smetek. The amended order states the specific affidavit paragraph numbers and grounds for which the objections were sustained or overruled. This interlocutory appeal followed.

After this Court notified the parties that the case was set for submission by oral argument, the Sunbelt Appellants filed a letter notifying this Court that a settlement had been reached between Monique and David and the Administrator. In that letter, the Sunbelt Appellants stated that they were writing to inform this Court of the settlement and to give this Court "an opportunity to take whatever action it deems appropriate to determine whether the underlying claims in the trial court and, as a consequence the arbitration controversy in the appellate court, have been rendered moot by settlement." In response, this Court requested supplemental briefing on the settlement and whether the settlement mooted the appeals. All parties filed supplemental briefing and confirmed that Monique and David and the Administrator had settled their claims and, thus, Monique's appeal was moot. The Sunbelt Appellants and Monique also contend that the settlement moots David's claims against the Sunbelt Appellants, and thus, their appeal, while David and the

Administrator contend that his claims against the Sunbelt Appellants remain. The Sunbelt Appellants also filed a motion to compel production of the settlement agreement, which this Court denied.

Accordingly, before addressing the merits of the Sunbelt Appellants' and Monique's appeals, we consider the threshold question of mootness.

### Mootness

Appellate courts are not to decide moot controversies, a rule rooted in constitutional prohibitions against rendering advisory opinions. *See Nat'l Collegiate Athletic Ass'n v. Jones*, 1 S.W.3d 83, 86 (Tex. 1999); *see also Valley Baptist Med. Ctr. v. Gonzalez*, 33 S.W.3d 821, 822 (Tex. 2000) (per curiam) ("Under article II, section 1 of the Texas Constitution, courts have no jurisdiction to issue advisory opinions."). A case becomes moot if there ceases to be an actual controversy between the parties at any stage of the litigation. *Jones*, 1 S.W.3d at 86; *see Robinson v. Alief I.S.D.*, 298 S.W.3d 321, 324 (Tex. App.—Houston [14th Dist.] 2009, pet. denied). If a judgment can have no practical effect on an existing controversy, the case becomes moot, and any opinion issued on the merits in the appeal would constitute an impermissible advisory opinion. *Thompson v. Ricardo*, 269 S.W.3d 100, 103 (Tex. App.—Houston [14th Dist.] 2008, no pet.). A case becomes moot if, during the appeal, either of the opposing sides of the litigation ceases to have a legally cognizable interest in the appeal's outcome. *See Jones*, 1 S.W.3d at 87.

11

## A.    Monique's Appeal

In their supplemental briefing related to the settlement, Monique, David, and the Administrator each state that there has been a settlement of their underlying claims against each other. Despite admitting in her briefing that, due to the settlement, her appeal was moot (and arguing that Sunbelt's appeal was moot as well), counsel for Monique contended at oral argument that the terms of the settlement agreement had not been fulfilled, and that she filed a motion to enforce the settlement agreement with the trial court within 30 days of the entry of the February 2022 dismissal orders, and therefore, her appeal in this case is not moot. The record before this Court does not include any motion to enforce the settlement agreement, any order on such motion, or any other information indicating that the settlement agreement was not complied with or that any party had revoked or attempted to revoke their consent to settlement. Rather, the supplemental clerk's record filed shortly before oral argument only contains the agreed motions to dismiss filed by Monique and David, as well as the trial court's February 3 and 7 orders dismissing all claims between Monique and David, with prejudice.[2]

---

[2]    We also note that Monique's supplemental brief, in which she argued that "the settlement . . . mooted the controversy between David and Monique" and prayed that this Court find that "this appeal has been rendered moot in its entirety by way of the settlement agreement," was filed approximately seven months after she contends her motion to enforce the settlement agreement was filed. Yet she makes no mention of the motion to enforce in her supplemental brief, nor did she request that a copy of the motion to enforce be included in a supplemental clerk's record.

The existence of an actual controversy is essential to the exercise of appellate jurisdiction. *See, e.g.*, *Valley Baptist Med. Ctr.*, 33 S.W.3d at 822. "Appellate courts are prohibited from deciding moot controversies." *Jones*, 1 S.W.3d at 86; *see City of Farmers Branch v. Ramos*, 235 S.W.3d 462, 469 (Tex. App.—Dallas 2007, no pet.) (noting that court may only decide issues presenting "a live controversy at the time of the decision"). If a controversy ceases to exist or the parties lack a legally cognizable interest in the outcome at any stage, the case becomes moot. *See Allstate Ins. Co. v. Hallman*, 159 S.W.3d 640, 642 (Tex. 2005); *Williams v. Lara*, 52 S.W.3d 171, 184 (Tex. 2001) (noting that "a controversy must exist between the parties at every stage of the legal proceedings, including the appeal"). "[C]ourts have an obligation to take into account intervening events that may render a lawsuit moot." *Heckman v. Williamson Cnty.*, 369 S.W.3d 137, 166–67 (Tex. 2012). If a proceeding becomes moot, the court must dismiss the proceeding for want of jurisdiction. *See id.* at 162.

Based on the record before us, which reflects that Monique, David, and the Administrator have settled the underlying claims and all claims pending between those parties, including the claims between these parties related to the Sunbelt accounts at issue in this appeal, have been dismissed by the trial court below, we

Rather, as noted above, she argued that the settlement and dismissal of the claims between herself and David and the Administrator mooted her appeal.

13

hold that a live controversy has ceased to exist between these parties and Monique's appeal is moot. Accordingly, we dismiss Monique's appeal for lack of jurisdiction. *See* TEX. R. APP. P. 42.3(a); 43.2(f).

**B.     The Sunbelt Appellants' Appeal**

A separate issue is whether the Sunbelt Appellants' appeal is also moot based on the settlement between Monique, David, and the Administrator. The Sunbelt Appellants contend that although David has not produced the settlement agreement, his counsel stated in email communications related to the settlement that "David disclaims any interest he has in the funds that are or have been in Monique's possession in Sunbelt Accounts xxx8186 (William Mandell) and xxx0104 (Monique Mandell)." The Sunbelt Appellants argue that David received settlement consideration far greater than the amount necessary to satisfy his claimed interest in the accounts and that, absent allocation evidence from David, receipt by David of any further sum in this action would result in a double recovery in violation of the one satisfaction rule. Monique likewise contends that the entire proceeding is moot based on the settlement because David's claims against the Sunbelt Appellants are based on his claimed entitlement to the funds in William's Sunbelt account, but by disclaiming any interest he had in the funds, David "cannot now claim that he is entitled to them." Thus, based on David's "express waiver to any rights in the

14

property made the subject of David's claims," Monique argues that his claims against the Sunbelt Appellants are untenable and the entire appeal is moot.

In contrast, David asserts that the only settlement was between David, the Administrator, and Monique, and that the trial court's orders dismissing his claims against Monique expressly reserved his claims against the Sunbelt Appellants. David also contends that the settlement agreement between himself and Monique could not release the Sunbelt Appellants for their separate tortious conduct.

### 1. One Satisfaction Rule

"Under the one satisfaction rule, a plaintiff is entitled to only one recovery for any damages suffered." *Sky View at Las Palmas, LLC v. Mendez*, 555 S.W.3d 101, 106–07 (Tex. 2018) (quoting *Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 390 (Tex. 2000)); *see also Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 7 (Tex. 1991) ("The one satisfaction rule applies to prevent a plaintiff from obtaining more than one recovery for the same injury."). The Texas Supreme Court first articulated the one-satisfaction principle in *Bradshaw v. Baylor University*:

> It is a rule of general acceptation that an injured party is entitled to but one satisfaction for the injuries sustained by him. That rule is in no sense modified by the circumstance that more than one wrongdoer contributed to bring about his injuries. There being but one injury, there can, in justice, be but one satisfaction for that injury.

84 S.W.2d 703, 705 (1935), *overruled in part by Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 432 (Tex. 1984). In *Stewart Title*, the Texas Supreme Court clarified

15

that the fundamental consideration in applying the one-satisfaction rule is whether the plaintiff has suffered a single, indivisible injury—not the causes of action the plaintiff asserts: "There can be but one recovery for one injury, and the fact that more than one defendant may have caused the injury or that there may be more than one theory of liability, does not modify this rule." 822 S.W.2d at 8. Thus, the rule applies both "when the defendants commit the same act as well as when defendants commit technically differing acts which result in a single injury." *Id.* at 7. In *First Title Co. of Waco v. Garrett*, the Court explained the rule's rationale as it applies to settlement credits for nonsettling defendants:

> [T]he plaintiff should not receive a windfall by recovering an amount in court that covers the plaintiff's entire damages, but to which a settling defendant has already partially contributed. The plaintiff would otherwise be recovering an amount greater than the trier of fact has determined would fully compensate for the injury.

860 S.W.2d 74, 78 (Tex. 1993). A nonsettling defendant seeking a settlement credit under the one-satisfaction rule has the burden to prove its right to such a credit. *Utts v. Short*, 81 S.W.3d 822, 828 (Tex. 2002); *Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917, 927 (Tex. 1998). In *Ellender*, the Court held that a nonsettling defendant meets this burden by introducing into the record either the settlement agreement or some other evidence of the settlement amount. 968 S.W.2d at 927; *see also Utts*, 81 S.W.3d at 828. "Once the nonsettling defendant demonstrates a right to a settlement credit, the burden shifts to the plaintiff to show that certain amounts should not be

credited because of the settlement agreement's allocation." *Utts*, 81 S.W.3d at 828. The plaintiff can rebut the presumption that the nonsettling defendant is entitled to settlement credits by presenting evidence showing that the settlement proceeds are allocated among defendants, injuries, or damages such that entering judgment on the jury's award would not provide for the plaintiff's double recovery. *See id.* at 828–29 (requiring nonsettling plaintiff to show that it did not benefit from settlement); *Casteel*, 22 S.W.3d at 391–92 (requiring showing of allocation between joint and separate damages); *Ellender*, 968 S.W.2d at 928 (requiring showing of allocation between actual and punitive damages); *First Title*, 860 S.W.2d at 79 (applying one-satisfaction rule when plaintiff did not show it settled for separate injury). A written settlement agreement that specifically allocates damages to each cause of action will satisfy this burden. *Ellender*, 968 S.W.2d at 928; *see also First Title*, 860 S.W.2d at 79 (examining contents of settlement agreement).

These one-satisfaction-rule cases cited by the Sunbelt Appellants, however, involve settlement credits applied after the jury had awarded damages in favor of the plaintiff against the nonsettling defendant. For example, in *Sky View*, the plaintiff settled with three defendants before trial, one defendant after trial but before entry of judgment, and proceeded to a jury trial against the remaining defendants. *Sky View*, 555 S.W.3d at 105 & n.4. After the jury rendered its verdict, and in response to the plaintiff's motion for entry of judgment, the nonsettling defendants alleged

that the plaintiff benefited from the settlement agreement with the other defendants based on the same injury for which the jury awarded him damages, and that allowing the plaintiff to recover the full amount of the jury's award would result in a double recovery. *Id.* at 110. The Texas Supreme Court noted that this "is a proper time and method to raise the one-satisfaction rule." *Id.*; *see also Utts*, 81 S.W.3d at 830 (holding that nonsettling defendant properly raised settlement-credit issue in response to plaintiff's motion for judgment).

These cases do not hold that the plaintiff's claims are moot against the non-settling defendants because of a settlement with other defendants, but instead hold that the plaintiff is only entitled to one recovery for the same injury. Thus, the application of the one satisfaction rule in these cases resulted in a settlement credit which mitigated some or all of the plaintiff's damages against the nonsettling defendant, not in the courts dismissing the plaintiff's claims against the nonsettling defendants as moot because of the settlement. The Sunbelt Appellants have not pointed this Court to any case law where a court has applied the one-satisfaction rule in the same procedural posture as this case, i.e., where a nonsettling defendant seeks to apply the one satisfaction rule before an award of damages has been rendered against the nonsettling defendant, nor have they cited to any case law applying this rule to render an appeal moot. Whether the Sunbelt Appellants will be ultimately entitled to a settlement credit based on David's settlement with Monique in the event

18

a jury (or arbitrator) finds in favor of David based on his claims against them does not make the Sunbelt Appellants' appeal moot. *See, e.g.*, *San Saba Energy, L.P. v. Crawford*, 171 S.W.3d 323, 332 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (holding that "[t]he application of [the one satisfaction] rule does not moot any issue in the case" because despite appellant's execution of release and assignment of royalty interest, even if operated to fully compensate appellant for alleged damages, live controversy still existed in that trial court could render take-nothing judgment); *see also Christus Health & Christus Health Gulf Coast v. Kone Inc.*, No. 14-07-00786-CV, 2009 WL 2496988, at *5 (Tex. App.—Houston [14th Dist.] June 25, 2009, pet. denied) (mem. op.) (application of one-satisfaction rule did not render appeal moot).

Thus, we decline to hold that David and the Administrator's settlement with Monique moots David's claims against the Sunbelt Appellants, as non-settling defendants, based on the one satisfaction rule.

### 2. Disclaimer

As noted above, Monique, and the Sunbelt Appellants to some extent, also contend that the Sunbelt Appellants' appeal is moot because, via the settlement, David has disclaimed any interest in or relinquished his claim to the funds from William's account. Thus, according to appellants, the entire proceeding is moot

19

because David's claims against the Sunbelt Appellants are based on his claimed entitlement to the funds in William's account.

The parties have not submitted the settlement agreement to this Court. Although the Sunbelt Appellants filed a motion to compel production of the settlement agreement, that motion was filed with this Court, not with the trial court, and did not provide this Court with any support demonstrating that an appellate court has the authority to compel production of documents. *See* Mot. to Compel (citing TEX. R. CIV. P. 192.3(g) (rule for practice in district and county courts permitting discovery of settlement agreements); 194.2(h) (former rule for practice in district and county courts requiring disclosure of settlement agreements in pre 1/1/2021 cases)).

Further, in Monique's supplemental briefing and in David's letter response related to the settlement agreement, and again at oral argument, Monique and David both indicated that they would provide the settlement agreement, under seal, if ordered to do so. Again, neither party has pointed to any authority of this Court to either seal documents or order parties to produce documents. And none of the parties has moved this Court to abate the appeal to allow the trial court to consider whether the settlement agreement should be (1) sealed, or (2) produced.

Without the language in the settlement agreement, we cannot determine the effect of David's purported "disclaimer." *See* TEX. PROP. CODE § 240.002(2)

20

(defining "Disclaim" as "to refuse to accept an interest in or power over property, including an interest or power the person is entitled to . . . by . . . other contract or arrangement"); *id.* 240.002(6) (defining "Disclaimer" as "the refusal to accept an interest in or power over property"); *id.* § 240.051(c) ("If an interest in property passes because of an event not related to the death of a decedent . . . a disclaimer of the interest . . . takes effect . . . as of the time the instrument creating the interest became irrevocable."). Meaning, it is not clear if David was disclaiming his interest in the funds in William's account as that term is used in the property code, or if he was agreeing to relinquish any claim to those funds in the future in exchange for the settlement. The parties do not cite to the statutes from the Property Code, nor expand on the disclaimer argument, except to say generally that if David has disclaimed any interest he has in the funds, "he cannot now claim that he is entitled to them."

Without the language of the settlement agreement, we are left with the motion to dismiss and orders from the trial court. In the agreed motion to dismiss filed in the trial court, David stated that he "no longer desire[d] to pursue the claims he raised in this matter against Monique," requested that the court dismiss, with prejudice, those claims, but "expressly d[id] not dismiss his claims against any other Defendant in this matter." This same language appears in the trial court's order granting the agreed motion to dismiss. A plaintiff may settle with one or more defendants and still retain a cause of action as to those remaining. *Henderson v. S. Farm Bureau Ins.*

21

*Co.*, 370 S.W.3d 1, 4 (Tex. App.—Texarkana 2012, pet. denied); *see also Underkofler v. Vanasek*, 53 S.W.3d 343, 346 (Tex. 2001) (agreeing that defendant was not entitled to summary judgment on basis that plaintiff's settlement of underlying case eliminated any claim for damages, in part, because settlement did not include all defendants). "A tortfeasor can claim the protection of a release only if the release refers to him by name or with such descriptive particularity that his identity or his connection with the tortious event is not in doubt." *Atl. Lloyds Ins. Co. v. Butler*, 137 S.W.3d 199, 218 (Tex. App.—Houston [1st Dist.] 2004, pet. denied) (quoting *Duncan*, 665 S.W.2d at 420).

Here, it is undisputed that the Sunbelt Appellants are not parties to the settlement and that David expressly reserved, i.e., did not dismiss, his claims against the Sunbelt Appellants. Based on what we have in the record before us, we cannot conclude that David's settlement with Monique, and any purported disclaimer of his interest in the funds from William's account, moots David's claims against the Sunbelt Appellants and, relatedly, the Sunbelt Appellants' appeal from the trial court's denial of their motion to compel arbitration of those claims. Thus, we turn to the merits of the Sunbelt Appellants' appeal.

**Motion to Compel Arbitration**

In their first issue, the Sunbelt Appellants argue that the trial court erred in denying their motion to compel arbitration because both William and David signed

22

valid agreements to arbitrate. The Sunbelt Appellants argue that the Brokerage Account Applications signed by William and David incorporated by reference the Brokerage Account Customer Application, which contained the applicable arbitration clause. In response, David and the Administrator argue that there was no valid agreement to arbitrate signed by either William or David because the arbitration agreements do not identify the parties and, with respect to William's purported arbitration agreement specifically, no evidence of the Client Agreement allegedly containing the arbitration clause was introduced into evidence.

## C. Standard of Review and Applicable Legal Principles

"We review a trial court's order denying a motion to compel arbitration for abuse of discretion." *Henry v. Cash Biz, LP*, 551 S.W.3d 111, 115 (Tex. 2018); *SK Plymouth, LLC v. Simmons*, 605 S.W.3d 706, 714 (Tex. App.—Houston [1st Dist.] 2020, no pet.). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner or acts without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985). "We defer to the trial court's factual determinations if they are supported by evidence but review its legal determinations de novo." *Henry*, 551 S.W.3d at 115.

A party seeking to compel arbitration under the FAA must establish that (1) there is a valid arbitration agreement and (2) the claims in dispute fall within that agreement's scope. *In re Rubiola*, 334 S.W.3d 220, 223 (Tex. 2011); *Simmons*, 605

S.W.3d at 714. Here, the parties initially dispute whether the Sunbelt Appellants met their burden to show that there was a valid, enforceable arbitration agreement.

The trial court's determination as to the validity of an arbitration agreement is a legal determination that we review de novo. *See Jody James Farms, JV v. Altman Grp., Inc.*, 547 S.W.3d 624, 633 (Tex. 2018); *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 227 (Tex. 2003). While there is a strong policy favoring arbitration, this policy does not apply to the initial determination whether there is a valid arbitration agreement. *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 737 (Tex. 2005). The presumption favoring arbitration arises only after the party seeking to compel arbitration establishes a valid agreement to arbitrate because "the purpose of the FAA [is] to make arbitration agreements as enforceable as other contracts, not more so." *Id.* at 738 (quoting *Bridas S.A.P.I.C. v. Gov't of Turkm.*, 345 F.3d 347, 354 n.4 (5th Cir. 2003)).

To determine whether there was a valid agreement to arbitrate, we apply ordinary principles of state contract law. *Simmons*, 605 S.W.3d at 715. The elements of a valid contract are (1) an offer, (2) an acceptance, (3) a meeting of the minds, (4) each party's consent to the terms, and (5) execution and delivery of the contract with the intent that it be mutual and binding. *Prime Prods., Inc. v. S.S.I. Plastics, Inc.*, 97 S.W.3d 631, 636 (Tex. App.—Houston [1st Dist.] 2002, pet. denied).

24

**D. William's Arbitration Agreement**

With respect to William's account, the Sunbelt Appellants argue that there was a valid agreement to arbitrate as evidenced by William's account application, which incorporated by reference the "Client Agreement" containing the applicable arbitration clause. The Sunbelt Appellants contend that the Brokerage Account Customer Agreement, attached to Smetek's affidavit as Attachment 14, is one and the same as the Client Agreement referred to in William's account application and contains the applicable arbitration clause. Essentially, therefore, the first dispute we must resolve is whether the unsigned Brokerage Account Customer Agreement, i.e., Attachment 14 to Smetek's affidavit, was incorporated by reference into the account agreement signed by William. We hold that it was not.

"A party cannot be required to arbitrate unless it has agreed to do so." *Trico Marine Servs., Inc. v. Stewart & Stevenson Tech. Servs., Inc.*, 73 S.W.3d 545, 548 (Tex. App.—Houston [1st Dist.] 2002, no pet.) (quoting *Hou–Scape, Inc. v. Lloyd*, 945 S.W.2d 202, 205 (Tex. App.—Houston [1st Dist.] 1997, orig. proceeding)). The parties' agreement to arbitrate must be clear. *Id.*

The doctrine of incorporation by reference provides that "an unsigned paper may be incorporated by reference in the paper signed[.]" *Owen v. Hendricks*, 433 S.W.2d 164, 166 (Tex. 1968); *see also Trico Marine Servs.*, 73 S.W.3d at 549. "The language used is not important provided the document signed by the defendant

plainly refers to another writing." *Owen*, 433 S.W.2d at 166. Plainly referring to a document requires more than merely mentioning the document. *Bob Montgomery Chevrolet, Inc. v. Dent Zone Cos.*, 409 S.W.3d 181, 189 (Tex. App.—Dallas 2013, no pet.). The language in the signed document must show the parties intended for the other document to become part of the agreement. *Id.* Furthermore, the incorporated document must be referenced by name. *Stewart & Stevenson, LLC v. Galveston Party Boats, Inc.*, No. 01-09-00030-CV, 2009 WL 3673823, at *11 (Tex. App.—Houston [1st Dist.] Nov. 5, 2009, no pet.) (mem. op.); *Gray & Co. Realtors, Inc. v. Atl. Hous. Found. Inc.*, 228 S.W.3d 431, 436 (Tex. App.—Dallas 2007, no pet.).

As noted above, William's account application itself did not include an arbitration clause, but instead stated as follows:

> Pre-Dispute Arbitration
>
> This account is governed by a pre-dispute arbitration clause, which appears on the last page of the Client Agreement, and you acknowledge that you have received a copy of this clause.

This provision plainly refers to a "Client Agreement" which contains the applicable "pre-dispute arbitration clause." The Sunbelt Appellants did not introduce any document entitled a "Client Agreement" in support of their motion to compel. Rather, the only document purportedly applicable to William's account was entitled a "Brokerage Account Customer Agreement."

While the Sunbelt Appellants contend that the words "customer" and "client" are synonymous, their interpretation ignores the case law set out above requiring a document to "plainly refer[] to" and "reference[] by name" another document in order for it to be incorporated by reference. *See Owen*, 433 S.W.2d at 166; *Bob Montgomery Chevrolet*, 409 S.W.3d at 189; *Stewart & Stevenson*, 2009 WL 3673823, at \*11; *Gray & Co. Realtors*, 228 S.W.3d at 436. Here, the document referenced in the account application and the purported incorporated document do not even have the same title. *Cf. Trico Marine Servs.*, 73 S.W.3d at 549–50 (holding reference in heading in proposal to "General Terms and Conditions of Sale" followed by blank space did not "plainly refer, as a matter of law, to any separate document" and, thus, did not incorporate by reference separate document containing arbitration clause, even though it was entitled "General Terms & Conditions of Sale"). While William's account application unambiguously refers to a Client Agreement, there is no mention of a separate Brokerage Account Customer Agreement in that account application. Nor is there any indication in the Brokerage Account Customer Agreement itself that it was alternatively entitled or referred to as the Client Agreement. Accordingly, we decline to hold that this reference to a "Client Agreement" in William's account application plainly referred to the

Brokerage Account Customer Agreement attached as Attachment 14 to the Smetek affidavit such that it was incorporated by reference.[3]

Because there was no Client Agreement before the trial court, and thus no evidence of the language of the arbitration clause contained in that Client Agreement, we hold that the trial court did not err in denying the Sunbelt Appellants' motion to compel arbitration on the basis that there was lack of evidence of a valid and enforceable arbitration agreement between William and the Sunbelt Appellants.

## E.    David's Arbitration Agreement

With respect to David's account, the Sunbelt Appellants likewise argue that the Brokerage Account Customer Agreement containing the arbitration provision was incorporated by reference into the account application. In response, David contends that even if the Brokerage Account Customer Agreement was incorporated

---

[3]    Furthermore, we find the case relied on by the Sunbelt Appellants in support of their incorporation by reference argument to be distinguishable. *See In re Raymond James & Assocs., Inc.*, 196 S.W.3d 311, 318–19 (Tex. App.—Houston [1st Dist.] 2006, orig. proceeding). In *Raymond James*, a panel of this Court considered whether a "New Account Form," which was signed by the plaintiffs and included a statement that, by signing, the account holders agreed to abide by the terms and conditions in the Client Agreement, including an arbitration clause, effectively incorporated by reference the Client Agreement. *Id.* at 318. This Court held that it did: "The New Account Form, in a statement just above the Account Holders' signature line, incorporates the Client Agreement by reference, plainly referring to the Client Agreement, which contains a binding arbitration clause." *Id.* at 319. There was no dispute in *Raymond James*, as there is here, however, about whether the Client Agreements introduced applied to the account holders. Thus, we find *Raymond James* inapplicable to the question before us today, i.e., whether the reference in the account application to the "Client Agreement" plainly refers to and incorporates a separate document titled by a different name.

28

by reference into the account application, it is not a valid arbitration agreement because it does not identify the parties.

In 2017, David sought to open his own individual investment brokerage account by signing a "Brokerage Account Application." The Brokerage Account Application directs that it is to be used to "open a brokerage account with your Broker/Dealer to be held at National Financial Services LLC." The Brokerage Account Application, however, does not define "Broker/Dealer," does not otherwise identify The Fisher Group or Sunbelt as the Broker/Dealer, and does not contain a reference to either The Fisher Group or Sunbelt anywhere in the document. The Brokerage Account Application is signed by Fisher, in the capacity of "Registered Rep," and by "Smetek," in the capacity of "Office Manager/Principal."

David's Brokerage Account Application contains the following language: "You acknowledge that this account is governed by a pre-dispute arbitration clause, which appears on the last page of the Brokerage Account Customer Agreement, and that you have read the pre-dispute arbitration clause." Included in the documents attached to Smetek's affidavit are a "Brokerage Account Customer Agreement" that the Sunbelt Appellants contend was incorporated by reference into David's account application. This Brokerage Account Customer Agreement includes the following definitions of "Who's Who in This Agreement":

29

In this document, "us," "we," and "our" refer to your Broker/Dealer. "NFS" is National Financial Services LLC, a NYSE member, whom we have engaged to provide custody and clearing services for us.

The terms "account owner," "you," and "your" refer to the owner(s) indicated on the account application.

The Brokerage Account Customer Agreement also includes the following language: "All controversies that may arise between me, my Broker/Dealer and NFS concerning any subject matter, issue or circumstance whatsoever . . . shall be determined by arbitration[.]"

As noted above, although there is a strong presumption favoring arbitration, that presumption arises only after the party seeking to compel arbitration proves a valid arbitration agreement exists. *Kellogg Brown & Root, Inc.*, 166 S.W.3d at 737; *see also Carr v. Main Carr Dev.*, LLC, 337 S.W.3d 489, 496 (Tex. App.—Dallas 2011, pet. denied) ("Even the exceptionally strong policy favoring arbitration cannot justify requiring litigants to forego a judicial remedy when they have not agreed to do so."). The parties' agreement to arbitrate must be clear, *see Trico Marine Servs.*, 73 S.W.3d at 548, including the identity of the parties who have agreed to arbitrate. *See VSR Fin. Servs., Inc. v. McLendon*, 409 S.W.3d 817, 827–29 (Tex. App.—Dallas 2013, no pet.); *see also McCarthy v. Azure*, 22 F.3d 351, 355 (1st Cir.1994) ("The federal policy [favoring arbitration], however, does not extend to situations in which the identity of the parties who have agreed to arbitrate is unclear.").

Neither the account application nor the Brokerage Account Customer Agreement for David's account reference Sunbelt or The Fisher Group by name. The only arbitration clause appears in the Brokerage Account Customer Agreement and provides that it applies between "You, your Broker/Dealer, and NFS." Furthermore, the arbitration clause purports to cover "[a]ll controversies that may arise between me, my Broker/Dealer and NFS concerning any subject matter, issue or circumstance whatsoever . . . ." However, "Broker/Dealer" is not defined anywhere in the Brokerage Account Customer Agreement. Thus, even if the Brokerage Account Customer Agreement was incorporated by reference into the account application, it does not define or identify the specific parties with which David is to arbitrate other than NFS and "your" or "my" "Broker/Dealer."

Further, although the account application is signed by Fisher, it identifies her only as "Registered Rep" not as Broker/Dealer. Similarly, although the account application is signed by "Smetek," his signature appears only in the capacity of "Office Manager/Principal" not in any apparent representative capacity of Sunbelt or as Broker/Dealer. Moreover, although the account application includes references to "Broker/Dealer," just like the Brokerage Account Customer Agreement, that term is not defined anywhere in the application.

Sunbelt appears to argue that Broker/Dealer as referenced in both the account application and the Brokerage Account Customer Agreement necessarily refers to

31

the Sunbelt Appellants, and therefore, David agreed to arbitrate his claims against them. What is clear from the evidentiary record in this case, however, is there is no definition in the account application or the Brokerage Account Customer Agreement of the term "Broker/Dealer," and neither the account application nor the Brokerage Account Customer Agreement declare Sunbelt or any other person or entity to be the "Broker/Dealer."

We find this case to be analogous to *VSR Financial Services*, 409 S.W.3d at 827–29, where the Dallas Court of Appeals considered a similar issue. There, the appellees sued VSR and the Chapman defendants, who provided accounting services and investment advice, for an investment loss sustained by appellees. *Id.* at 821–22. Appellees opened brokerage accounts and signed a "VSR New Account Form," which identified VSR by name and was signed by one of the Chapman defendants in the capacity of a "Registered Rep." *Id.* at 822. The "VSR New Account Form" did not contain an arbitration clause. *Id.* The appellees also signed account agreements, which contained an arbitration clause encompassing disputes between the account owner and the "Introducing Firm, Clearing Agent and any Sub–Advisor (and/or any other agent)," and incorporated by reference terms and conditions that contained an identical arbitration provision as the account agreement. *Id.* The term "Introducing Firm" was not defined in either the account agreement or the terms and

conditions, nor was VSR or any other entity declared to be the "Introducing Firm" in either document. *Id.*

Considering whether VSR and the Chapman defendants could enforce the arbitration provisions against the appellees, the Dallas court noted that VSR is not a named party to the Agreements, there is no definition in the Agreements or the Terms and Conditions of the term "Introducing Firm," and neither the Agreements nor the Terms and Conditions declare VSR or any other entity to be the "Introducing Firm." *Id.* at 828. The court rejected VSR's argument that the evidence could not be construed "in any way other than concluding that reference to the Introducing Firm was intended to mean VSR," explaining that "the question is not whether we believe VSR could be the 'Introducing Firm,' [but rather] the trial court abused its discretion in concluding there was no clear agreement between VSR and appellees to arbitrate." *Id.* at 828–29. The court concluded that the trial court should not have found a valid, enforceable agreement between VSR and appellees to arbitrate, and thus, did not abuse its discretion in denying the motions to compel arbitration. *Id.* at 829.

For these same reasons, we hold that the Sunbelt Appellants failed to carry their burden to establish the existence of a valid and enforceable arbitration agreement between them and David. Therefore, the trial court did not abuse its discretion in denying the Sunbelt Appellants' motion to compel arbitration based on David's account.

33

Because we hold that the Sunbelt Appellants failed to carry their burden to introduce evidence of a valid and enforceable arbitration provision related to either William or David's accounts, we do not reach their remaining arguments in their first issue related to whether David's claims fall within the scope of the arbitration provisions, or their arguments in their fourth issue related to whether the trial court erred in denying their motion to compel arbitration based on David and the Administrator's defenses to enforcement. Accordingly, we overrule the Sunbelt Appellants' first and fourth issues.

In their second and third issues, the Sunbelt Appellants argue that the trial court abused its discretion by sustaining various conclusory and hearsay objections to Smetek's affidavit submitted in support of their motion to compel arbitration. However, the evidence the Sunbelt Appellants argue was erroneously excluded was not necessary to resolve the dispositive argument before this court, which is the legal question of whether a valid agreement to arbitrate existed between the Sunbelt Appellants and David or William. As this excluded evidence was not relevant to our legal determination that no enforceable arbitration agreement existed between the Sunbelt Appellants and David or William, we do not need to consider whether the affidavit in question was adequate evidence. *See* TEX. R. APP. P. 47.1.

We overrule the Sunbelt Appellants' second and third issues.

## Conclusion

Having found no valid and enforceable arbitration agreement, we affirm the interlocutory order of the trial court denying the Sunbelt Appellants' motion to compel arbitration. We further dismiss Monique's appeal as moot.

<div style="margin-left: 50%;">

Amparo Guerra
Justice

</div>

Panel consists of Justices Goodman, Hightower, and Guerra.